# IN THE UNITED STATES BANKRUPTCY COURT

# FOR THE DISTRICT OF IDAHO

_____

In Re:

BERT R. MARBLE and                    **Bankruptcy Case**
KAREN MARBLE,                         **No. 06-40696-JDP**

      **Debtors.**

_____

BERT R. MARBLE and
KAREN MARBLE, husband
and wife,

      **Plaintiffs,**

**vs.**                               **Adv. Proceeding No 07-8048**

UNITED STATES OF
AMERICA, acting through
the FARM SERVICE AGENCY,

      **Defendant.**

_____

## MEMORANDUM OF DECISION
_____

Brent T. Robinson, ROBINSON & ASSOCIATES, Rupert, Idaho,
Attorneys for Plaintiffs.

Warren S. Derbidge, Assistant United States Attorney, Boise, Idaho,
Attorneys for Defendant.

MEMORANDUM OF DECISION - 1

## Introduction

In this adversary proceeding, Plaintiffs Bert and Karen Marble (collectively "Plaintiffs"),[1] contend that Defendant Farm Service Agency ("FSA"), acting through its employees, breached an agreement between the parties, causing significant loss to Plaintiffs. *See*, Complaint, Docket No. 1. Defendant generally denies all allegations of wrongdoing. *See*, Answer, Docket No. 6.

The trial in this action was conducted on April 24, 25, and 29, 2008, at which the parties appeared and presented evidence and testimony. At the conclusion of the evidentiary presentation, counsel sought leave to submit closing briefs. The Court granted the request, and the parties have filed their submissions. Docket Nos. 31-34. After considering the evidence and testimony presented, the arguments of the parties, and the relevant legal authorities, this Memorandum constitutes the Court's findings of fact

---

[1] This adversary proceeding arises out of a family-owned farming business. Although only Bert and Karen are plaintiffs in this action, their sons were also involved in the business and critical events discussed herein. To avoid confusion when referencing individuals in the Marble family, first names are used in this Memorandum. No disrespect is intended by this informality.

MEMORANDUM OF DECISION - 2

and conclusions of law, and disposition of the issues.  Fed. R. Bankr. P.

7052.[2]

## Facts[3]

For nearly 40 years, Plaintiffs have owned and operated a family

farming operation headquartered near Malad, Idaho.  They grew grain,

hay, and sod, and raised livestock.  Although their farming operation was

originally much smaller, by 1986 it spanned approximately 4,200 acres,

which included both dry and irrigated farmland, as well as pasture land.

In 1986, Plaintiffs found themselves in serious financial difficulty.

There had been a severe drought the year before, resulting in a poor

---

[2] Unless otherwise indicated, all chapter and section references are to the
Bankruptcy Code, 11 U.S.C. §§ 101-1532, and all rule references are to the Federal
Rules of Bankruptcy Procedure, Rules 1001-9037.

[3] The findings of the Court that follow include both disputed and
undisputed facts.  In resolving disputed issues of fact, the Court has carefully
considered the testimony of the various witnesses, and based upon its
opportunity to observe them testify, the Court has assessed their credibility.
Since the testimony of the witnesses was in some instances inconsistent with
other evidence presented, the Court's findings reflect its judgment concerning
the relative weight assigned to that testimony.  In general, the Court finds the
testimony of the Plaintiffs and their sons to be credible, and has assigned
considerable weight to their version of the facts.

MEMORANDUM OF DECISION - 3

harvest.  They were in the process of installing an irrigation system when

the bank that had financially supported Plaintiffs' business failed.  In

addition, Plaintiffs were selling a significant amount of feed to dairy

farmers, but due to the rise of a federal dairy buy-out program, their sales

significantly declined.  Ultimately, in 1987, Plaintiffs sought relief in

bankruptcy by filing a chapter 11 petition.  Plaintiffs were able to confirm a

chapter 11 plan in April, 1989, and commenced making payments to

creditors under that plan.[4]

At the time of their bankruptcy filing, Plaintiffs had an outstanding

obligation to FSA for a loan, which was secured by a third priority

mortgage on their real estate.  Under Plaintiffs' confirmed chapter 11 plan,

although the total amount due was substantially written down, Plaintiffs

agreed to pay FSA a total of $175,000 together with 6% interest in annual

installments of $12,713.55.  Ex. 207.  Plaintiffs commenced making

payments under the plan and continued their farming operations.

---

[4]  Portions of the confirmed plan are attached to a letter, and included in
Ex. 207.

MEMORANDUM OF DECISION - 4

At some point near the year 2000, it became difficult for Plaintiffs to manage their existing irrigation system[5] so they decided to convert to a pivot irrigation system.  Plaintiffs had previously had dealings with Cache Valley Bank ("CVB"), having received several annual operating loans from that bank.  CVB loaned Plaintiffs approximately $750,000 to convert to a pivot irrigation system.  For some reason, however, rather than simply making them a separate equipment loan with an extended repayment term, the loan was added to their current annual operating loan.  Of course, this proved problematic, since when that loan became due the following year, Plaintiffs were unable to pay the entire balance.  In 2002, after extensive negotiations, Plaintiffs and CVB agreed to restructure the debt.  Plaintiffs signed a new note (the "CVB Note") for $1,834,745.93, which called for nine semiannual payments of $81,400, and a balloon payment of $1,827,843.99.[6]  Ex. 101.

---

[5] Karen testified that the irrigation system at the time consisted of approximately 58 half-mile wheel lines.

[6] The first semiannual payment was due on November 15, 2002; subsequent payments were due in May and November of the next four years.

MEMORANDUM OF DECISION - 5

Around the time Plaintiffs were converting to their new irrigation system, Plaintiffs' son Tyson Marble ("Tyson") spent one year on a sod farm in Washington, where he learned generally how to manage a sod business. Upon his return to Idaho, together with Tyson, Plaintiffs decided it would be a wise investment to enter the sod business, and in 2000 they planted grass seed. From the testimony, it appears that one irrigation pivot was dedicated to the sod crop.

In order to allow the sod to establish, Plaintiffs waited until 2002 to harvest a sod crop. When they did begin selling sod, their principal customers were in Utah. Most of these buyers were landscaping businesses, which would purchase sod from Plaintiffs, and then resell it to their own customers at a marked-up price. Initially, Plaintiffs had difficulty keeping track of the customers' payment checks and getting them back to Malad efficiently for processing. After discussions with their buyers, Plaintiffs decided to establish a separate account at U.S. Bank. Each of the buyers were issued a special card that allowed them to deposit

───────────────

The final balance was due on May 15, 2007. Ex. 101.

MEMORANDUM OF DECISION - 6

the proceeds of the sales directly into Plaintiffs' account at local U.S. Bank branch offices, where Plaintiffs were then able to access them.  Plaintiffs continued using this payment system in subsequent years.

In 2003, after making their first payment on the CVB Note, Plaintiffs attempted to obtain additional financing from CVB to operate.  CVB declined to extend them additional credit, as Plaintiffs' total debt to the bank was approaching $2,000,000.  When Plaintiffs' application was denied, they sought financing from several other financial institutions. They were unsuccessful.

Unable to obtain conventional financing, in the spring of 2003, Plaintiffs applied for an operating loan from FSA in the amount of $200,000, FSA's annual operating loan limit.[7]  Plaintiffs worked closely with Kim Jenkins ("Jenkins"), a County Executive Director for FSA, in FSA's Malad office to complete the loan application.

---

[7] Plaintiffs actual operating expenses would greatly exceed this amount. For example, the "Farm and Home Plan Summary Table Report" lists Plaintiffs' operating expenses for 2003 at $593,880.  Ex. 108.

MEMORANDUM OF DECISION - 7

As part of the application process, Jenkins prepared what is known as a farm and home plan.  This plan is a fairly comprehensive document which outlines, *inter alia*, a borrower's current assets and liabilities, and projected income and expenses during the term of the anticipated loan.  In his preparation of that document, Jenkins decided to list only one payment - that due in November - to be made on the CVB Note during the term of the loan.  *See* Ex. 109.  Despite only listing one payment, Jenkins testified at trial that at the time he completed and processed Plaintiffs' loan application, he was aware that the semi-annual payments were actually due in May and November each year.  However, as they testified, when the plan was being prepared, Plaintiffs had sufficient cash available to make the May payment prior to the FSA loan being approved and funds disbursed.  Their bank account statement for May, 2003 confirms this testimony and shows that a check to CVB did in fact clear on May 16, 2003. Ex. 115.  Jenkins therefore felt comfortable including only one semiannual payment to CVB in the plan.

MEMORANDUM OF DECISION - 8

In addition to the farm and home plan, Jenkins also prepared a narrative summary of Plaintiffs' farming operation and loan proposal. Ex. 105. In that assessment, Jenkins indicated that all borrower debts had been verified and entered on the farm and home plan. *Id.* at 5. Jenkins also noted that "[t]he plan is feasible with a margin of $43,904." *Id*. at 4. Because Jenkins did not have authority to finally approve a loan in this amount, the application was forwarded on to the FSA state office in Boise. In May, 2003, Plaintiff's loan application and farm plan was finally approved.

After the funds were disbursed, Bardell Faux ("Faux"), a Farm Loan Manager for FSA, was assigned to administer Plaintiffs' loan. On October 29, 2003, Faux met with Plaintiffs and Tyson in the Malad office to introduce himself, and to generally discuss Plaintiffs' farming operation. In the notes he contemporaneously prepared about the meeting, Faux noted that Plaintiffs' crop production and sod sales had been lower than the amounts projected in their farm plan. *See* Ex. 117. One reason for the lower yields was the drought conditions during the growing season. With

MEMORANDUM OF DECISION - 9

respect to the livestock, Faux noted that Plaintiffs typically sold their calves in the spring, and that the calf income may be as projected.  *Id.* Faux's notes also reference the upcoming payment due to CVB on November 15, 2003, and that a subsequent payment was due on May 15, 2004.  Prior to the meeting's conclusion, Faux arranged a field visit to Plaintiffs' farm to be made the following week.

This field visit occurred on November 3, 2003, during which Faux was taken to observe and inspect all aspects of Plaintiffs' farming operation at various farm locations.  Bert, and two of his sons, Bryson and Tyson, accompanied Faux on this visit.  Bert, Bryson, and Tyson all testified that during the visit, Faux's comments regarding Plaintiffs' operation of the farm were generally complimentary.  However, at the conclusion of the visit, the tenor of the discussions quickly changed.

They discussed the upcoming payment to CVB which was due on November 15, 2003, and Bert queried about obtaining additional financing. Faux explained that additional funds could not be disbursed while the existing $200,000 FSA operating loan remained outstanding.  In addition,

MEMORANDUM OF DECISION - 10

Faux questioned whether that operating loan had ever been feasible because, Faux had discovered, only one of Plaintiffs' payments to CVB had been included in the farm plan. According to Bert, Bryson, and Tyson, Faux then explained that, in his opinion, in order for Plaintiffs to be able to make the November payment on the CVB Note, Plaintiffs must sell their crops and livestock immediately. The implication was that before FSA would cooperate in extending additional financing, Plaintiffs needed to quickly sell their crops and livestock and pay down their existing obligation to FSA.

While the Marble participants in the conversation all claim he made it clear that an immediate liquidation of their hay crop and livestock was a requirement, Faux denies imposing any such condition on the continued relationship between FSA and Plaintiffs. On the other hand, Bryson credibly testified that his father was so visibly upset with Faux's position that it was one of the only times that he had seen his father cry. Tyson confirmed Bert's reaction. While Faux may insist otherwise, his comments obviously were subject to reasonable interpretation as a demand by Faux,

MEMORANDUM OF DECISION - 11

on behalf of FSA, that Plaintiffs undertake an immediate liquidation of their hay and livestock.

Shortly after the field visit, on November 5, 2003, Bert pleaded with Faux on the phone to change his mind, knowing that an immediate sale of his hay crop and livestock would result in a significant loss in income.[8] Karen listened in on this telephone conversation and testified that Faux said (again) that Plaintiffs had to sell everything immediately. Having been unsuccessful in persuading Faux, Bert immediately called other FSA employees in the Preston and Boise offices to attempt to avoid a rushed sale of the cattle and hay. Plaintiffs both testified that everybody Bert spoke with at FSA informed them that they needed to do what Faux told them.

Feeling like FSA had left them no choice, Plaintiffs reluctantly began making preparations to sell their cattle at the next livestock auction. Karen

---

[8] The evidence shows that Plaintiffs typically held their cattle over the winter and sold them in the spring, when the animals weighed significantly more and could demand a higher price. It is undisputed that Plaintiffs had adequate facilities and resources to hold the cattle over the winter.

MEMORANDUM OF DECISION - 12

called the brand inspector, and although he was busy that afternoon, he

agreed to meet them at the stockyards in Malad later that evening to

inspect the animals prior to transporting them to the auction the following

day.[9] After the inspection was complete, the animals were loaded up and

hauled to Smithfield, Utah for the auction.  Lane Parker, the owner of the

auction yard, had been doing business with Plaintiffs for fourteen years

and had become familiar with their operation.  Parker testified that it

seemed like Bert was under pressure, and he questioned why he was

selling the cattle in such a rushed fashion in the fall.  According to Parker,

Bert felt like he was being forced to sell.  The next morning, on November

6, 2003, the calves were sold for a total of $63,753.22.[10]  Exs. 124, 125.

---

[9] Bryson testified that it was customary for the brand inspector to come to
the farm to inspect the animals prior to auction, and that it was unusual to have
to meet him in a different location.  However, due to the limited time frame in
which Plaintiffs needed to sell their livestock, it was necessary here because
otherwise the inspector would not have been able to complete his work before it
became too dark to do the inspection.

[10] When the calves were sold, Bert requested that the auctioneer list FSA
as an additional payee on the checks.  Parker testified that he and his staff
performed a lien search but could not find any record of FSA's lien, and therefore
they declined to list FSA as a payee on the check.

MEMORANDUM OF DECISION - 13

Shortly after the calves were sold, Plaintiffs were able to locate a buyer for their hay crop.  The buyer, Lamon Loucks, agreed to pay $50 per ton for each of the first and second cut of the crop, and $95 per ton for the third cut.  However, he arranged to pick up the hay, and Plaintiffs were not allowed to truck the crop to the buyer as they had historically done.[11] As a result, Plaintiffs lost any income from the trucking.  Plaintiffs received an initial down payment in the amount of $75,000 in the form of a check from Loucks made payable to Bert Marble.[12]

On November 17, 2003, Plaintiffs met with Faux in the Preston FSA office to discuss the possibility of releasing to Plaintiffs some of the crop proceeds from FSA's lien to use to pay the November payment on the CVB Note and other expenses.  Plaintiffs brought checks from the cattle sales,

---

[11]  Tyson testified that, normally,  Plaintiffs were able to charge an additional $23 per ton to a buyer when they delivered the hay crop to buyers using Plaintiffs' trucks.  Of that additional amount, $6 per ton was used for fuel and equipment maintenance, resulting in a net profit of $17 per ton.

[12]  Under their agreement, Loucks agreed to pay an additional $80,000 after the first 1,000 tons of hay had been transported.  The balance of the contract price was due within thirty days of remaining crop being transported.  Ex. 129.

MEMORANDUM OF DECISION - 14

the hay down payment, and wheat crop insurance[13] with them to the

meeting.  During the meeting, Faux became aware that FSA was not listed

as a payee on all of the checks.  Unable to reach an agreement as to the

release of the proceeds, Bert retained the checks and explained he would

not cash them until he had considered his options.

Following that meeting, Faux called Parker and informed him that

FSA did in fact have a lien on the calves.  Parker confirmed Bert's

testimony that he and his staff were informed about the lien, but their

search did not reveal a lien of record with FSA.  Ex. 122.  Faux also called

Ben Massey, the contact person for the hay sale, and left a phone message

for him.  Over the next few days, Faux left two additional phone messages

with Massey.

Because the relationship between Plaintiffs and Faux had become

strained, and unable to reach an agreement with Faux regarding a release

of some crop proceeds, Plaintiffs attempted to negotiate directly with FSA

---

[13] Due to frost and drought conditions in 2003, Plaintiffs' wheat crop was
extremely meager.  Plaintiffs had received a crop insurance payment for the
wheat in the amount of $37,858.  Ex. 121.

MEMORANDUM OF DECISION - 15

agents in the state office in Boise.  Plaintiffs contacted Gary Thomas, an

accountant, and together with him, met with FSA supervisors Jim

Reynolds and Aaron Johnson in Boise on November 21, 2003.  At that

meeting, FSA representatives agreed to release the hay and wheat

proceeds to Plaintiffs.  Reynolds endorsed the back of the hay check as

"Jim Reynolds, Farm Service Agency (FSA), Farm Loan Specialist."  Ex.

130.  Then, realizing that FSA was not listed on the front of the check,

Reynolds added "& FSA" after Bert's name as a payee.  *Id*.  After the

meeting, Plaintiffs deposited the hay and wheat checks at their bank.  Ex.

128.  On November 24, 2003, Plaintiffs obtained a cashier's check made

payable to CVB in the amount of $81,400, and delivered the check the

same day.  *Id.*

On November 26, 2003, Bert called Faux to inform him that Loucks

had placed a stop payment on the $75,000 hay check.[14]  In the notes of that

---

[14]  Before the $75,000 check had been processed by the bank, Bert had
already drawn checks to three creditors, including the cashier's check to CVB.
When payment on the check was stopped, it caused Plaintiffs checking account
to become overdrawn.

MEMORANDUM OF DECISION - 16

conversation, Faux records: "Bert said the stop payment was placed

because of call I made to hay buyer." Ex. 123.  As a result of the

complications with the hay check, the Loucks hay sale was ultimately lost.

Bert testified that he felt that Faux had caused the loss of the sale.  After

the Loucks hay contract was cancelled, Plaintiffs were able to secure a

separate contract for the sale of the hay to A. Scott Jackson Trucking, Inc.

In March of 2004, Plaintiffs applied to FSA for an operating loan for

2004.  Todd Tueller, FSA Farm Loan Manager in the Preston office, was

assigned to process that application.  Notwithstanding their compliance

with Faux's demand to sell their livestock and hay as well as payment of

significant amounts on the 2003 FSA loan, Plaintiffs' application met

additional resistance.  Tyson testified because the 2003 loan had not been

paid in full, Tueller, on behalf of FSA, required Plaintiffs to produce

contracts with their sod buyers establishing a guaranteed price and

quantity of sod to be purchased during 2004.  Because they could not be

sure of the amount of sod they would require, Plaintiffs' buyers balked at

any arrangement with Plaintiffs committing them to buy, and so they

MEMORANDUM OF DECISION - 17

discontinued their business with them.  Eventually, Plaintiffs' application

for a 2004 operating loan was denied.  Ex. 207.

Over the next several months, Plaintiffs continued to make

payments on the outstanding balance of FSA's loan.  The source of many

of these payments were federal DCP checks.  On March 21, 2005, Plaintiffs

made their final payment on the loan, paying the loan in full.  Ex. 205.

On December 8, 2006, Plaintiffs again sought relief in bankruptcy

and filed a chapter 12 petition.  On March 7, 2007, Plaintiffs filed their

chapter 12 plan, to which several creditors objected, including FSA.  In

FSA's objection, it indicates that Plaintiffs' plan references an adversary

action alleging claims against FSA that had not yet been filed or served on

FSA.  On April 11, 2007, the Court denied confirmation of Plaintiffs' plan.

In the interim, however, Plaintiffs' filed this adversary proceeding, which

is the same adversary proceeding referenced in FSA's objection to

confirmation and Plaintiffs' original chapter 12 plan.  Thereafter, Plaintiffs

filed an amended chapter 12 plan on May 11, 2007, which was ultimately

confirmed on June 13, 2007.

MEMORANDUM OF DECISION - 18

## Discussion

### I.

The terms of the 2003 operating loan agreement between Plaintiffs and FSA can be found, essentially, in two documents: a promissory note and a form FSA-1962-01.[15] Together, these documents outline the specific obligations of the parties.

The promissory note, signed by Plaintiffs on May 9, 2003, provides that "[p]rincipal and interest *shall* be paid in 1 installments [sic] . . . on or before . . . May 9, 2004." Ex. 113, emphasis added. Under the note, prepayments by Plaintiffs on the balance due were authorized, but not required: "Prepayments of scheduled installments, or any portion of these installments, may be made at any time *at the option of the Borrower*." *Id*., emphasis added.

As security for the note, Plaintiffs granted FSA a security interest in all of their crops and livestock. Ex. 114. Plaintiffs' obligations with respect

---

[15] Form FSA-1962-01 is entitled "Agreement for the Use of Proceeds / Release of Chattel Security." Ex. 140A.

MEMORANDUM OF DECISION - 19

to the disposition of FSA's collateral and any sale proceeds are set forth in

detail in form FSA-1962-01.  Ex. 140A.  In that form, Plaintiffs  projected

their anticipated yields and, based thereon, the estimated sale proceeds for

the various crops and livestock, and agreed with FSA as to how those

proceeds could be used by Plaintiffs.  Under this approach, so long as

Plaintiffs disposed of their crops in accordance with the form, no other

permission by FSA was required prior to disposition of any collateral.  Ex.

114.  However, if Plaintiffs desired to use the crop or livestock sale

proceeds in some fashion other than indicated in the form, prior FSA

permission was required.[16]  *Id.*  Plaintiffs signed this form on May 6, 2003.

*Id.*

        According to the FSA-1962-01 in the record, Plaintiffs agreed to use

their crop and livestock sale proceeds as follows:

---

        [16]  Prior approval was not required, however, for dispositions that resulted
in changes to the "Quantity," "Month," or "Amount of Proceeds" sections of the
form.  But, sales resulting in such changes were required to be promptly reported
to FSA.  Ex. 114, ¶ H.

MEMORANDUM OF DECISION - 20

| Property Description | Projected Proceeds | Use of Proceeds |
|---|---|---|
| Wheat | $123,627 | FSA 2003 OL[17] ($123,627) |
| Alfalfa Hay | $252,800 | Case Credit ($10,468); Case Credit ($4,783); AgCo Finance ($41,762); Farm Credit ($9,181); First National ($7,182); Farm Operating ($179,425) |
| Sod | $220,000 | Cache Valley ($81,400); Interbay ($6,179); US Bank ($840); FSA 2003 OL ($2,907); FSA - 41[18] ($4,314); Replacements ($12,000); Farm Operating ($112,360) |
| Beef Steers & Heifers | $60,466 | FSA 2003 OL ($60,466) |
| Cull Livestock | $8,400 | FSA 41 Loan ($8,400) |
| DCP Payment | $20,000 | FSA 2003 OL ($20,000) |
| Disaster Payment | - | FSA All |

---

[17] "FSA 2003 OL" refers to the $200,000 annual operating loan that is the subject of this proceeding.

[18] "FSA - 41" refers to the prior obligation to FSA that was the subject of Plaintiffs prior chapter 11 bankruptcy case.

MEMORANDUM OF DECISION - 21

Although the proceeds from the hay and sod were to be allocated among the FSA, various other creditors, and Plaintiffs' additional operating expenses for their farm, there is no indication in the form that payments were to be made to creditors in any particular order. Nor is there any indication when those payments were due. However, as his recorded notes reflect, Faux maintained that when crops were sold, FSA was to be paid first and that payment was due immediately. *See* Ex. 118 ("Discussed that payment is due on the 2003 OL as commodities are sold."); Ex. 119 ("The loan is to be paid as the commodities are sold."); Ex. 120 ("[Bert] also feels he was forced to sell calves and hay earlier than usual to pay FSA. This was due to the condition that FSA is to be paid before release to other creditors."); Ex. 121 ("[Plaintiffs] feel FSA is unreasonable in requesting payment at this time [November 17, 2003] when the loan payment is not due until 5/9/04. Discussed with them that payment is due when the crops and livestock are sold.").

II.

MEMORANDUM OF DECISION - 22

"When the United States enters into contract relations, its rights and duties therein are governed generally by the law applicable to contracts between private individuals." *Lynch v. United States*, 292 U.S. 571, 579 (1934).  General contract law principles apply to the construction of government contracts.  *Sulmeyer v. United States (In re Bubble Up Delaware, Inc.)*, 684 F.2d 1259, 1262 (9th Cir. 1982).  A breach of contract includes both a party's non-performance of a contractual duty of immediate performance without legal excuse, as well as the prevention, hindrance or interference with another party's performance.  *Hughes v. Idaho State University*, 835 P.2d 670, 672 (Idaho 1992) (citing Black's Law Dictionary 188 (6th ed. 1990)).

Here, while FSA denies it, the overwhelming weight of the evidence shows, and the Court so finds, that FSA, acting through its agents, breached its agreement with Plaintiffs by substantially interfering with their farming operations and performance of their obligations under their FSA contract.  Simply put, the parties' agreement did not require Plaintiffs to sell their livestock and crops in a frantic fashion in the fall.  The only

MEMORANDUM OF DECISION - 23

reason Plaintiffs did so was because of demands and pressure asserted

upon them by Faux, acting on behalf of FSA. Likewise, the only reason

Plaintiffs solicited advanced contracts on their future sod crop was

because Tueller required that they do so. The requirements imposed upon

Plaintiffs by FSA's agents were contrary to the parties' agreement and

interfered with Plaintiffs' farming operation and performance obligations

under the contract. Accordingly, FSA's actions constitute a breach of the

parties' contract.

Not only was a rushed sale of Plaintiffs' livestock and crops not

required under the terms of the note or FSA-1962-01, it was contrary to

Plaintiffs' historical practices. The testimony of several credible witnesses

was uniform in showing that Plaintiffs had always sold their cattle in the

spring. Indeed, Faux acknowledged that he was aware that this was

Plaintiffs' typical practice. *See* Ex. 117. For Plaintiffs to sell in the fall was

contrary to their financial interests, and Plaintiffs and Faux were cognizant

of this fact.

MEMORANDUM OF DECISION - 24

FSA's interference with Plaintiffs' farming operations is manifest in Plaintiffs' hesitance to go forward with the November sales.  Rather than immediately make arrangements to sell after Faux's field visit on November 3, 2003, Plaintiffs attempted to contact others they knew at FSA in an attempt to avoid such a sale.  Their credible testimony was that everyone they spoke to told them they needed to do exactly what Faux, as the local agent, had told them.  Only after Plaintiffs exhausted all channels of communication did they reluctantly go forward with the arrangements for the sales.

Moreover, there was no financial incentive to sell the livestock in the fall; indeed, there was a significant disincentive to doing so.  The only party that potentially stood to gain from a fall sale was FSA, as Plaintiffs could not apply the proceeds of the livestock sale to the CVB Note.[19] However, neither the promissory note nor the FSA-1962-01 required

---

[19]  The FSA-1962-01 indicates that the proceeds from the livestock were to be applied to the operating loan.  Ex. 140A.

MEMORANDUM OF DECISION - 25

Plaintiffs to make prepayments on their $200,000 operating loan

obligation.

FSA's witnesses all acknowledged that FSA had no legal right to

compel Plaintiffs to liquidate their crops and livestock in the fall.  Faux,

implying that if they did not immediately sell they would be in default on

their operating loan and unable to obtain any further credit,

inappropriately coerced Plaintiffs into making a detrimental business

decision, which would severely prejudice their financial welfare.

III.

In this action, Plaintiffs seek to recover actual damages as a result of

FSA's breach of contract.  As a general rule, "when a wrong has been done,

and the law gives a remedy, the compensation shall be equal to the injury.

. . .  The injured party is to be placed, as near as may be, in the situation he

would have occupied if the wrong had not been committed."  *Albemarle*

*Paper Co. v. Moody*, 422 U.S. 405, 418-19 (1975).  With respect to damages,

the Idaho Supreme Court has stated that "[b]reach of contract damages are

those arising naturally from the breach and are reasonably foreseeable."

MEMORANDUM OF DECISION - 26

*Appel v. LePage*, 15 P.3d 1141, 1144 (Idaho 2000).  Foreseeability is a

question of fact.  *Id.*  Actual damages are always recoverable, but

consequential losses are only compensated if it can be shown that the

parties contracted with them in view.  *Suitts v. First Sec. Bank of Idaho, N.A.,*

713 P.2d 1374, 1381 (Idaho 1985).

This Court finds and concludes that, as a result of FSA's actions,

Plaintiffs sustained actual and foreseeable damages with respect to their

livestock and their hay and sod crops.  Plaintiffs, together with an expert,

Craig Clarke, a certified public accountant and fraud examiner, testified as

to the economic damages suffered by Plaintiffs as a consequence of their

hasty liquidation of their livestock and sod crop.  Their testimony was

persuasive.

By selling their livestock in the fall, rather than in the spring as they

typically did, Plaintiffs' calves were lighter than they would have been in

the spring, and they lost the benefit of accessing the special advertising

MEMORANDUM OF DECISION - 27

done on their behalf by the auction yard for a spring sale.[20]  These factors

were taken into consideration in Clark's damage calculations.

　　To calculate the total loss resulting from the rushed livestock sale,

Clark took the difference in animal weight from the fall to the spring and

multiplied that by the amount received per pound and the number of

calves sold.  That amount was then reduced to account for the hay which

would have been required to sustain the calves until the spring, or 1.5 tons

per calf at $58 per ton.  Clark used a similar approach to account for the

loss resulting from the inability to advertise or market the calves at a

special auction.  In this calculation, Clark used a figure in the middle of the

range, or $0.075 per pound.  These amounts were then added together and

multiplied by a present value factor of 1.3833.[21]  The Court finds that

---

[20] Historically, Plaintiffs had been invited to list their livestock on a mailer
advertising a special auction that Parker sent to buyers in Utah and the
surrounding area.  The mailers were sent out approximately 30 days in advance
of the auction, and typically drew out buyers interested in purchasing large
amounts of livestock.  The testimony reflected that these special auctions
typically generated between $0.05 and $0.10 more per pound for sellers than
amounts paid at the regular weekly auctions.

[21] The same present value factor is used in all of the Court's calculations
in this decision.

MEMORANDUM OF DECISION - 28

Clark's analysis is fundamentally sound, that Plaintiffs' losses have been adequately established, and accordingly, finds Plaintiffs' total livestock loss as a result of the hasty sale to be $24,419.22.[22]

The rushed sale of their hay crop also resulted in a substantial loss to Plaintiffs.  Although the price Plaintiffs ultimately obtained for their hay did not vary significantly from the price they could have expected had they been able to market the crop as they normally did, the sale in this fashion deprived them of the financial advantage of charging their buyers to transport the product, resulting in a considerable loss of transportation revenue.  For their transportation services, Plaintiffs usually charged $23 per ton.  Of that amount, $6 was used for fuel and maintenance on their trucks, resulting in a net profit of $17 per ton of hay trucked to a customer.

---

[22] Step One:  134 (number of calves) x 166.11 lbs (difference in weight) x $1.0341 (actual price received per pound) - $11,658 (cost of feed hay) = $11,359.76.

Step Two: 134 (number of calves) x $0.075 (averaged advertising loss) x 626.18 (average weight of spring calves) = $6,293.11

Step Three:  ($11,359.76 + $6,293.11) x 1.3833 (present value factor) = $24,419.22 (total livestock loss).

MEMORANDUM OF DECISION - 29

By multiplying this amount by the total amount of hay they sold in the fall, and applying the present value factor, Plaintiffs' total loss for the hay is $68,568.95.[23]

Plaintiffs were made to believe that unless they obtained advance sod contracts they would be unable to obtain additional financing. Absent this requirement by Tueller, Plaintiffs would not have solicited such contracts from their customers. Accordingly, FSA's requirement that Plaintiffs obtain advance contracts with sod purchasers caused Plaintiffs to lose customers and suffer a significant loss with respect to their 2004 sod crop.[24] Plaintiffs' sod loss is based upon anticipated sales of 850,000 square feet. To arrive at their total loss, Clark took the difference between the anticipated sales and the actual sales, multiplied it by the average sales price, reduced it by the cost to harvest the sod ($160 per acre), and then

---

[23] 2,915.83 tons x $17.00 per ton x 1.3833 = $68,568.95.

[24] Although Plaintiffs attempted to project the loss from the sod crop through the year 2007, the Court found any attempt to project losses beyond 2004 to be too speculative. Accordingly, the Court refused to hear or consider any evidence or testimony pertaining to losses beyond the year 2004.

MEMORANDUM OF DECISION - 30

multiplied it by the present value factor.  While the Court agrees with the

method used by Clark, it takes issue with two of the values used in the

calculation.

First, Clark used an average sale price for the sod of $0.175 per

square foot, however, Ex. 166 shows an average sale price in 2004 of $0.155

per square foot.  The Court finds the lower amount to be appropriate.

Second, Clark calculates the cost to harvest the sod at $1,906.

However, in arriving at that number, Clark only multiplied the cost to

harvest sod by the actual amount of sod sold, or 331,030 square feet.  The

cost to harvest the sod should have been multiplied by the total amount of

anticipated sales, or 850,000 square feet.

Using these adjusted values, and based upon Plaintiffs' and Clark's

testimony, the Court finds the total sod loss suffered by Plaintiffs in 2004

when adjusted to present value is $106,954.28.[25]

---

[25]  Step One:  518,970 sq. ft (amount of lost sales) x $0.155 (price per sq. ft) -
$3,122.14 (cost to harvest 850,000 sq. ft) = $77,318.21 (net sod loss).

Step Two: $77,318.21 x 1.3833 (present value factor) = $106,954.28 (total sod loss).

MEMORANDUM OF DECISION - 31

## Conclusion

FSA was keenly aware of Plaintiffs' typical marketing methods

when it agreed to loan them operating funds in 2003.  The parties'

agreement did not allow FSA to dictate how Plaintiffs were to manage

their farming business, and in particular, absent a default, did not allow

FSA to compel Plaintiffs to sell their crops and livestock to pay off the loan.

When Faux arrived on the scene, while they had suffered reduced yields

primarily due to weather, Plaintiffs were not in default on the loan

agreement.  Even so, looking to further FSA's interests, Faux pressured

Plaintiffs into selling their sod and livestock.  FSA superiors declined to

countermand Faux's decision.  Moreover, when Plaintiffs turned to FSA

for help in paying off their loan and preserving their operation, Tueller

required them to contact their sod buyers to propose new sale terms,

which resulted in Plaintiffs' loss of established customers and sales

opportunities.

While FSA insists it did nothing improper, the Court finds and

concludes that FSA, acting through its agents, breached its agreement with

MEMORANDUM OF DECISION - 32

Plaintiffs by requiring them to sell their crops and livestock early so as to,

at least in part, apply the proceeds to early payment on the FSA operating

loan.  Plaintiffs have established by competent proof that they experienced

foreseeable damages as a result of FSA's breach in the total amount of

$199,942.45.

Counsel for Plaintiffs and FSA are directed to cooperate in the

submission of an approved form of judgment for entry by the Court.

Dated:  July 1, 2008

_____
Honorable Jim D. Pappas
United States Bankruptcy Judge

MEMORANDUM OF DECISION - 33